# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO: 08-cr-21158-JORDAN/McALILEY

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**JOEL STEINGER, et.al.,**

**Defendant(s).**

_____//

### DEFENDANT JOEL STEINGER'S MOTION FOR SEVERANCE SO AS TO ALLOW STEINGER THE OPPORTUNITY TO PRESENT McNERNEY'S EXCULPATORY TESTIMONY WHICH WILL BE UNAVAILABLE TO STEINGER AT A JOINT TRIAL, WITH INCORPORATED MEMORANDUM OF LAW

If any one person is in a position to offer exculpatory testimony for Joel Steinger, that person is Michael J. McNerney, the lawyer who represented, Mutual Benefits Corporation ("MBC") practically from its inception and who helped develop its business model.  There is no other witness who combines McNerney's legal expertise and experience in the viatical industry, his intimate knowledge of MBC's business model and his hands-on involvement in giving *bona fide* legal advice to Steinger and others at MBC concerning many of the decisions made by MBC.  His testimony goes to the very core of the case charged against Joel Steinger because he advised Steinger on what disclosures were legally required to be made to purchasers and in regulatory filings and how the premium funds were to be managed pursuant to the Trust Agreement form signed by the purchasers of policies**.**

In order to present McNerney's clearly exculpatory testimony at his own trial,

Page 2

Defendant, Joel Steinger ("Steinger"), is now moving, pursuant to the provisions of Fed.R.Crim.P.14, the Due Process Clause of the Fifth Amendment, the Compulsory Process Clause of the Sixth Amendment and the authority of *Byrd v. Wainwright*, 428 F.2d 1017 (5th Cir. 1970) and its progeny, for this Court to grant a severance of defendants in this case and try his case separately from that of his co-defendant Michael McNerney.

## INTRODUCTION

The Indictment charges Joel Steinger and his three co-defendants, Steven Steiner, Michael McNerney and Anthony Livoti, with conspiracy to commit mail and wire fraud, 23 substantive counts of mail and wire fraud and conspiracy to commit money laundering.  All charges arise out of the business activities of MBC, which sold viatical and life settlements to the general public.

This motion is predicated upon Steinger's need to present exculpatory testimony from co-defendant Michael McNerney, who will not testify at a joint trial but will testify on Steinger's behalf at a separate trial.  This motion is being filed in a timely manner pursuant to this Court's deadline for filing motions for severance. The motion contains a detailed proffer of specific and exonerative facts to which McNerney would testify if severed, predicated upon a sworn affidavit of McNerney which McNerney's counsel will be filing *ex parte* and *in camera* so that this Court can satisfy itself that the proffer is made in good faith.  McNerney's affidavit is comprehensive and supported by documentary exhibits which are part of the discovery in this case and which will be exhibits at the trial.

## THE CHARGES

Count 1 of the Indictment charges a conspiracy to commit mail and wire fraud which

Page 3

allegedly centered around the sale of viatical and life settlements by MBC to purchasers.

Steinger's purported role is alleged in ¶ 14 of the General Allegations, at page 5:

> [d]efendant JOEL STEINGER, a/k/a/ "Joel Steiner," one of the founders of MBC, was MBC's principal executive, managing all important business activities. His approval was required for all major decisions affecting MBC, including decisions on legal issues, policy acquisitions and sales, and premium accounts. JOEL STEINGER also had an active role in MBC's "policy acquisition department," where he bid on insurance policies and assigned individual investors to those policies. Despite, JOEL STEINGER's role as principal executive, his true role in the company's operation was not disclosed to investors or regulators. Instead, he was represented to be a general consultant who provided various services to MBC.

The alleged role of Michael McNerney, the co-defendant whom Steinger wishes to call as a defense witness, is set forth in ¶¶17 through 20, at pages 5 -6. Paragraph 17 points out that McNerney is an attorney licensed in Florida, that he had a long standing relationship with Steinger, that MBC was a "significant" client of McNerney's law firm and that McNerney was the primary partner handling and supervising almost all MBC matters. Paragraph 18 alleges that McNerney and his firm provided a variety of duties fo MBC, concluding with the assertion that, "McNERNEY, and others under his supervision and at his direction, reviewed documents associated with the acquisition, transfer, and sale of insurance policies, and directed the distribution of investor funds." Paragraph 19 alleges McNerney participated in the marketing of MBC's viatical and life settlement settlements. Paragraph 20 alleges that:

> MICHAEL McNERNEY also handled traditional legal services for MBC, including but not limited to, drafting and filing regulatory documents on behalf of the company, and representing MBC and its principals in numerous lawsuits and regulatory matters brought by investors who alleged that they had been defrauded by MBC.

The government's prosecution of Steinger is largely predicated upon a "concealment" theory.  The Indictment alleges that:

> [t]he purpose of the conspiracy was for the defendants and their co-conspirators to unjustly enrich themselves by misappropriating monies from investors for their personal use and benefit by means of materially false and fraudulent representations **and concealment of material facts concerning, among other things, the safety and security of MBC investments and the expected profits of these investments.**

Indictment, at p.11, ¶3 (emphasis added).  Although the conspiracy count alleges a number of unspecified "fraudulent representations," it also alleges that Steinger and his co-defendants *concealed* "The True Management of MBC and Its Related Entities" from investors and regulators.  *See* Indictment, heading, p.12. Specifically, the Indictment alleges that the following matters were <u>concealed</u> from investors:

1) That Joel Steinger was MBC's controlling principal.  *See* Indictment, Count 1, at p.12, ¶8;

2) That Joel Steinger was referred to as an outside consultant who worked for a company named Kensington Management, Inc., which was a shell company with no offices or employees, formed solely for Steinger to receive his share of the proceeds from MBC. *See* Indictment, Count 1,  at pp.12-13, ¶9;

3) That L.S. was originally listed as MBC's President until in or around 1997, when Florida state regulators learned that L.S. had a regulatory history for defrauding investors. Thereafter Peter Lombardi was given the title "President" of MBC. Peter Lombardi, represented to be the sole shareholder, had few responsibilities.  Joel Steinger remained primary controlling principal throughout MBC's operation.  *See* Indictment, Count 1, p.13, ¶10;

4) That Joel Steinger had a criminal and regulatory disciplinary history, which included a prior federal criminal conviction for fraud in 1981, and several anti-fraud injunctions in 1978, 1989, and 1998, *see* Count 1, at pp.13-14, ¶11a-e;

Page 5

5)      That there were "numerous regulatory actions against MBC, its principals, and its sales agents . . . based on complaints alleging that MBC had defrauded investors, *id.*, at p.15, ¶12.

The mail and wire fraud counts incorporate all of these alleged acts of concealment by reference.  *See* Indictment, at p.23, ¶4; *id.* at p.25, ¶4.

A second significant prong to the government's case is its claim that the defendants, through MBC's sales force, "falsely promised investors a 'fixed return' on their investment, depending on the life expectancy that MBC predicted for the insured on the particular policy." *See* Indictment, Count 1, at p.16, ¶17.

The third significant prong to the government's case is its claim, set forth in ¶22 through 25, that the procedure through which the money being set aside to pay premiums due on life insurance policies during the projected life expectancy of the insured were managed and used to pay premiums on open policies was fraudulent in nature.

**PROFFER OF MICHAEL McNERNEY'S EXPECTED TESTIMONY**[1]

If a severance is granted, Steinger will be in a position to present exculpatory testimony from Michael McNerney which will refute the core allegations of the Indictment and establish a defense to these charges.

McNerney's testimony will be critical both to refute the government's "concealment"

-----

[1]Michael McNerney's attorney is submitting a lengthy affidavit to this Court on an *ex parte* basis, under seal for this Court's *In Camera* review. Counsel for Steinger has been provided with an unsigned copy of the affidavit and is aware of its contents. This proffer is based upon the affidavit. Due to the length of the affidavit, it is impractical to quote it verbatim.  This proffer will be presented in the form of a summary, with selected quotations from the affidavit as necessary. References to the affidavit will be by paragraph number.

theory of prosecution and to establish a defense of good faith reliance on advice of counsel for Steinger.  As McNerney states in his affidavit:

> The Indictment alleges that much of the fraud was committed through the "**concealment** of material facts concerning, among other things, the safety and security of MBC investments and the expected profits of these investments." Indictment, at p.11, ¶3 (emphasis added). As explained below, my law firm prepared various purchaser forms containing all the disclosures about the investments that I believed were required by law (¶3).

McNerney's affidavit makes clear that he will testify in detail concerning the legal advice he gave to Steinger and MBC concerning what disclosures they were legally obligated to make to prospective purchasers and regulators as well as the underlying legal rationale for that advice.

It was Joel Steinger who, beginning in 1996, asked BMMST to provide legal advice to MBC regarding its disclosure duties under the law. (¶71).  After the *Life Partners* case was decided by the D.C. Circuit Court of Appeal,[2] McNerney's belief was that the federal securities statutes and regulations did not apply to viatical settlements and that the disclosure requirements were governed only by state statutes (¶73)**.**  McNerney will testify that a number of state statutes required viatical settlement providers to be licensed and to make certain specific disclosures to sellers and purchasers (¶72).  McNerney participated in drafting various versions of the Purchase Agreement Form and Trust Agreement Form, as well as other forms in order to comply with the required disclosures in respective state laws. These forms were periodically revised by BMMST, approved by McNerney and submitted to state regulators for their approval (¶74). McNerney will testify that his belief

---

[2]*SEC v. Life Partners, Inc., 8*87 F.3d 536 (D.C. Cir. 1996).

at the time was that these forms contained all the necessary disclosures required by the Viatical Settlement Act, as well as by similar statutes in other states (¶75).

Specifically with regard to disclosures to purchasers, McNerney will testify that he informed MBC, probably through Joel Steinger, that the disclosures contained within the state-approved forms were sufficient to comply with the purchaser disclosure requirements of the various state statutes regulating viatical settlements and gave the legal opinion that, based on his reading of the *Life Partners* appellate decision, federal securities laws did not mandate any additional disclosures directly to purchasers (¶77).

McNerney will testify that, at some point by 1996, he learned that Joel Steinger had been convicted of fraud in federal court in the late 1970's or early 1980's and that both Joel Steinger and Les Steinger had been the subject of civil regulatory actions in connection with the sale of commodities, although he does not recall when he learned the precise nature of those actions (¶¶38-39). It was his view, based upon legal research of experienced lawyers whom he respected, that the state and federal statutes did not impose a duty on MBC to disclose these facts to purchasers of viatical settlements (¶80). McNerney will explain:

> Moreover, I believed that, under MBC's new business model, matters such as MBC's financial condition and the quality of its management were not relevant to the success of the viatical transactions because MBC never handled either the purchaser's money or the insurance proceeds (*i.e.,* the death benefits). Rather, the purchaser's money was handled by an escrow agent (*e.g.,* BMMST or a financial institution) and the death benefits were paid directly from the insurance company to the purchaser. I believed at the time that, under the applicable state statutes, the legal problems encountered by Joel Steinger and Les Steinger were not disclosable and, in any event, had no bearing on the value or riskiness of the insurance policies being purchased. Moreover, even under proposed securities regulations

dealing with life settlements, Joel Steinger's conviction was too ancient to be disclosable directly to purchasers.  Thus, to my recollection, I never advised the Steingers that they had a duty to disclose their personal histories directly to the purchasers of insurance policies (¶81).

With respect to disclosure of state regulatory actions, McNerney will testify that MBC's new business model was challenged by a number of regulators in different states on the basis that the viatical settlements constituted "securities" under respective state laws (¶82) and that:

My view at the time was that the only purchaser disclosures required by state laws where MBC was licensed were those required by the Viatical Settlement Act (and similar statutes in other states). I was unaware of any state or federal statute that required MBC to disclose pending or past regulatory actions directly to prospective purchasers.  Accordingly, I did not advise MBC to make such disclosures directly to purchasers (¶83).

McNerney will also testify about the disclosures to regulatory agencies. In his affidavit he states that in 1996, Florida law began requiring that viatical settlement providers be licensed by the Florida Department of Insurance ("FDOI") and that BMMST assisted and provided legal advice to MBC in connection with its applications for licenses in Florida and in other states (¶¶84-86). He states that he reviewed many of the applications and supporting documents and, to the best of his recollection, Les Steinger was identified as the President of MBC, but Joel Steinger's affiliation was not disclosed in the years 1996 and 1997)(¶¶87-89).  McNerney explains:

Although I knew at the time that Joel Steinger was one of the founders of MBC and was involved in major decisions affecting MBC, I did not believe in 1996-97 that MBC was legally required to include Joel Steinger's affiliation with MBC on the Florida application or any applications it filed.  So, I did not advise MBC that Joel Steinger's affiliation had to be disclosed (¶92).

McNerney will testify about the 1997 Consent Order with the FDOI, pursuant to

which Les Steinger resigned as President of MBC and Peter Lombardi became the new President, but was permitted to continue to work with purchasers and prospective purchasers of policies on behalf of MBC (¶94-95)[3].  McNerney states:

> To my recollection, prior to the middle of 1998, MBC did not formally disclose Joel Steinger's involvement with MBC in response to questions posed by various states in their viatical settlement licensing applications.  Moreover, to my recollection, for at least one year after Les Steinger was replaced by Peter Lombardi as President of MBC in or about March 1997, MBC did not formally disclose Les's continued involvement with MBC.

> In my opinion at the time, which I communicated to both Joel and Les, because the Steingers were not officers, directors, or shareholders of MBC, and therefore had no *legal* authority to exercise control over the operations of MBC, disclosure of their involvement was not required on the various applications (¶¶98-99).

McNerney will also testify about the SEC Complaint for Injunctive and Other relief that was filed in May 1998[4] and which is the subject of ¶11e of Count 1 of the Indictment, at page 14.  This Complaint alleged that from October 1994 to April 1996, the Steingers, through MBC, made certain misrepresentations to the purchasers of unregistered viatical settlements.  McNerney notes that there was  no allegation in the SEC Complaint that the revised model then being used by MBC (i.e. May 1998) violated any securities laws(¶101).

McNerney will testify about the resulting Consent Final Judgment that was entered into between the SEC and the Steingers.[5]  McNerney's affidavit states that following entry of the consent judgment, BMMST reviewed the specific questions that MBC had answered

---

[3]The Consent order is attached to the affidavit as <u>Exhibit C</u>.

[4]Attached as <u>Exhibit D</u> to the affidavit.

[5]Attached as <u>Exhibit E</u> to the affidavit.

Page 10

when it applied for or renewed its viatical licenses with the various states and sought advice of outside counsel (¶104). McNerney then recommended to the Steingers and Lombardi that MBC should formally disclose the Steinger's ongoing relationship with MBC (¶105). McNerney states that, to his recollection, after mid-1998 MBC routinely disclosed in writing the Steingers' association with MBC to most if not all of the states where MBC was licensed, typically in an annual report or an addendum and, to his recollection, also provided state regulators with a copy of the written consulting agreements that were executed between MBC and the Steingers' consulting companies (¶106). McNerney even quotes the typical written disclosure, which he states was the work product of BMMST (including himself) and another law firm (¶107).[6]

McNerney's testimony also will directly refute the government's contention that the defendants, through MBC's sales force, "falsely promised investors a 'fixed return' on their investment, depending on the life expectancy that MBC predicted for the insured on the particular policy," *See* Indictment, Count 1, at p.16, ¶17, and provide a good faith reliance on advice of counsel defense to this allegation. Specifically, McNerney states:

> The Purchase Agreement form stated that the return to the purchaser was a "fixed return on purchase price," that the return was <u>not</u> an annualized return, and that "[i]n the event the Purchaser is required to pay premiums, such payments will reduce the fixed returns referenced above." <u>Exhibit A</u>, at ¶¶34-35[7].

---

[6]The typical written disclosure form is <u>Exhibit F</u> to the affidavit.

[7]The Purchase Agreement is attached as <u>Exhibit A</u> to McNerney's affidavit.

I advised MBC that it was legally permissible to characterize the return to the purchaser as expressly stated in the Purchase Agreement form approved by state regulators (¶¶78-79).

McNerney's testimony also will address the management of the premium funds consistent with the Trust Agreement, which allowed under certain circumstances for premiums that had been assigned to one policy, as well as interest on premiums, to be applied to another policy.

McNerney's affidavit contains a detailed description of how the escrow fund for payment of future premiums was established and maintained.  He states:

> Where a Trustee (*e.g.,* Livoti) was involved, funds for the payment of future premiums, sufficient to cover the assigned LE (or the assigned LE plus some additional period of time) would be escrowed in the Trustee's trust account at the time of Closing.  Those premiums were to be paid in regular intervals to insurance companies by the Trustee in the manner specified in the Trust Agreement[8] and the Purchase Agreement (¶65).

McNerney's affidavit addresses the closing and the fact that if the purchaser purchased a  portion of a life insurance policy, a company named Viatical Services, Inc. (VSI) was responsible for maintaining contact with the insured and advising beneficiaries when to file the death claims. McNerney also describes the options available to purchasers of entire life insurance policies (¶67-68).

McNerney's testimony concerning the Trust Agreement is significant.  In his affidavit, he states:

> The standard Trust Agreement form (<u>Exhibit B</u>), as it evolved, provided that the funds held by the Trustee for payment of future premiums did not belong

---

[8]The Trust Agreement is attached as <u>Exhibit B </u>to McNerney's affidavit.

to the purchaser, and the purchaser had no right to those funds. <u>Exhibit B</u>, at ¶5.  The Trust Agreement form expressly provided that interest earned in the Trustee's accounts and any unused premiums may be retained in the Trustee's account as a "reserve" for payment of premium on any policy where the insured outlived the projected life expectancy.

Indeed, the Trust Agreement form provided that future premiums on a policy were to be paid or satisfied by (1) application for disability premium waiver when applicable; (2) payment by the Trustee from funds designated for the particular policy at the time of closing; (3) payment by the Trustee from other "reserve" funds that had accumulated in the Trustee's account; (4) VSI, up to the amount of funds in its premium reserve account, or any other service company that provided premium coverage as part of its service; or (5) pro rata by the purchaser(s).  <u>Exhibit B</u>, at ¶7 (¶¶69-70).

McNerney makes it clear that the management of the premium funds was to be done by MBC in conformity with the Trust Agreement and that he advised Joel Steinger and Livoti that the funds held by Livoti as trustee must be applied to premiums in this manner. McNerney will testify that the Trust Agreement form signed by the purchasers was prepared by BMMST lawyers, reviewed by him and approved by the FDOI (¶108).  He states:

The Trust Agreement form, as it evolved, expressly provided that the escrowed funds did not constitute the property of the purchaser, and that the purchaser had no right to those funds.  <u>Exhibit B</u>, at ¶5. The Trust Agreement form further provided that when the premiums escrowed for a particular policy had been expended, future premiums on that policy could be paid from a number of different sources, including from unused premiums on any other policy that had matured and interest earned on funds held in the premium reserve account.  <u>Exhibit B</u>,  at ¶¶5-7. The Purchase Agreement form, as it evolved, contained similar disclosures.  <u>Exhibit A</u>, at ¶¶21-22, 35 (¶109).

I advised Livoti and Joel Steinger that the funds held by Livoti as Trustee must be applied to premiums consistent with the language of the Trust Agreements and Purchase Agreements signed by the purchasers (¶111).

As McNerney's affidavit makes clear, Michael McNerney was uniquely qualified to

give Steinger and MBC his legal advice. There is no question that McNerney is a well-respected member of the Florida Bar who, over his long career, served, *inter alia,* as Chairman of the Board of Trustees of the University of Florida Law School, on the Board of Governors of the Florida Bar and as Chairman of the Florida Supreme Court nominating Committee (¶¶11 - 19).

With respect to McNerney's expertise and specialization in the area of viatical and life settlement, there can be no dispute with his assertion that, "For a number of years, I was considered an authority on viatical law and regulations" (¶23). He describes in detail his background and involvement in professional organizations involving viaticals and in the drafting of model legislation dealing with investments in viaticals (¶20). He talks about his extensive involvement in the drafting of amendments to the Florida Viatical Settlements Act and his work on proposed changes to viatical legislation nationally (¶21). He relates his experiences working as a liaison for the viatical industry and the Life Insurance Settlement Association ("LISA") with several prominent regulatory organization on the promotion of more comprehensive viatical laws and regulations and how he was principal spokesperson for the viatical and life settlements industry with regard to various proposed revisions to the model legislation and regulations (¶22).  His discussion of Viatical Settlements generally, amply demonstrates his intimate knowledge and expertise on how the Viatical business operates (¶¶24 - 29).

McNerney's affidavit also makes clear that the legal advice and representation which he gave to Steinger and MBC was not given in a vacuum, but that he was closely and intimately knowledgeable about MBC's product, its business model and its principals.

McNerney will testify that MBC was incorporated in October 1994 and that McNerney's law firm, BMMST, began representing MBC in or about late 1995 or early 1996 and continued its representation until May 2004, when a Receiver was appointed (¶30-31). At the time BMMST was engaged to represent MBC, McNerney already knew Joel Steinger and Les Steinger, having represented them before (¶32).  McNerney will testify that he was the senior equity partner at BMMST with primary responsibility to manage the relationship with MBC.  He states, "I was the lawyer at BMMST primarily responsible for communicating legal advice, either orally or in writing, to MBC"(¶34).  He will testify:

> Although I communicated either orally or in writing with Joel Steinger, Les Steinger, and Peter Lombardi, most of my interaction was with Joel Steinger, with whom I communicated regularly about legal and regulatory issues affecting MBC. I met alone with Joel Steinger on numerous occasions and also had many one-on-one telephone conversations with him. I had less contact with Steven Steiner, Les Steinger, and Peter Lombardi (¶37).

At the time McNerney commenced his representation of MBC, MBC's business model was similar to Life Partner's Inc.'s model (¶44). The SEC had brought an action against Life Partners in federal court in Washington, D.C., alleging that Life Partners was selling unregistered securities in violation of federal law and the district court judge had ruled that Life Partner's Inc's viatical settlements were "securities" subject to registration and other requirements under federal securities laws[9](¶41 - 42).

The SEC was also investigating a number of MBC's business practices including, but not limited to, whether MBC's purchase and sale of insurance policies meant that it was

---

[9]*SEC v. Life Partners, Inc.* 898 F. Supp. 14 (D.D.C. 1995) & 912 F. Supp. 4 (D.D.C. 1996), *rev'd* 87 F.3d 536 (D.C.Cir. 1996)

selling "securities" for purposes of federal and state registration and disclosure requirements (¶40). Joel Steinger asked McNerney to review MBC's business model in light of the ongoing *Life Partner's* litigation and, based upon that review, McNerney advised MBC, primarily through the Steingers and Lombardi, to modify its business model to alleviate certain concerns expressed by the SEC (¶45).

McNerney will testify in detail about the specific recommendations which he made to Steinger and Lombardi concerning modifications which should be made to MBC's business model in order to address the concerns expressed by the SEC (¶46-49). He also will testify that MBC implemented the changes that he recommended (¶50). He states that after the Court of Appeal reversed the district court in the *Life Partners* case and held that Life Partner's viatical settlement contracts were not "securities" subject to the federal securities laws, he advised the Steingers and Lombardi to continue with the new business model, except that MBC could resume brokering fractionalized interests in policies (¶51-52).

McNerney's affidavit establishes that he has an intimate understanding of the operation of MBC's business model from mid-1996 until it ceased operations (¶53-70). This includes, *inter alia*, the means through which MBC would, through independent agents or brokers, identify insureds wishing to sell their policies and evaluate and bid on the policies (¶54), its use of independent contractors, many of whom were licensed insurance agents and/or financial planners who would offer their clientele the opportunity to purchase all or part of an interest in the life insurance policy (¶56) and the procedure pursuant to which prospective purchasers would enter into a standard Viatical Settlement

Purchase Agreement with MBC[10] and the manner in which the sale was "closed" (¶55, 57-64, 66-67).  All of this testimony will prove that when McNerney gave his legal advice to Steinger and MBC he had all of the material facts at this disposal necessary for him to give competent legal advice.

## ARGUMENT

The Fifth and Sixth Amendments to the United States Constitution guarantee to a criminal defendant the right to due process of law, the right to a fair trial, and the right to compulsory process to obtain the testimony of defense witnesses. This right to present the testimony of witnesses to establish a defense is fundamental. In *Washington v. Texas,* 388 U.S. 14, 19 (1967), the Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law.

To assure that these constitutional guarantees are protected in cases where the defendant seeks the exculpatory testimony of a codefendant, the Eleventh Circuit and its predecessor, the former Fifth Circuit, have set out in detail the analysis for a trial court to follow. The seminal case in this circuit is *Byrd v. Wainwright,* 428 F.2d 1017 (5ᵗʰ Cir. 1970).[11] In *Byrd,* a defendant in a state court rape case sought a severance from his co-

---

[10]The Purchase Agreement is attached as <u>Exhibit A</u> to McNerney's affidavit.

[11]*See, Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981).

**SHOHAT, LOEWY & SHOHAT** - PENTHOUSE TWO, 800 BRICKELL AVENUE, MIAMI, FLORIDA 33131-2911

defendants in order to adduce their testimony from them that he had not been involved in the rape.  *Byrd*, 428 F.2d at 1018. The state court denied the motion, and the defendant was convicted.  *Id*.  Judge Atkins of this Court granted the defendant's habeas corpus petition, finding that the denial of the severance motion violated due process. *Id*.  The Fifth Circuit affirmed.  In so doing, the Court identified five broad areas for trial courts to consider when passing on such motions for severance:

> (1)  Does the movant intend or desire to have the co-defendant testify?  How must his intent be made known to the court, and to what extent must the court be satisfied that it is bona fide?
>
> (2)  Will the projected testimony of the co-defendant be exculpatory in nature, and how significant must the effect be? How does the defendant show the nature of the projected testimony and its significance?  Must he in some way validate the proposed testimony so as to give it some stamp of verity.[sic]
>
> (3)  To what extent, and in what manner, must it be shown that if severance is granted there is likelihood that the co-defendant will testify?
>
> (4)  What are the demands of effective judicial administration and economy of judicial effort?  Related to this is the matter of timeliness in raising the question of severance.
>
> (5)  If a joint trial is held, how great is the probability that a co-defendant will plead guilty at or immediately before trial and thereby prejudice the defendant, either by cross-defendant prejudice or by surprise as it relates to trial preparation?

*Byrd*, 428 F.2d at 1019-20 (footnotes omitted); *accord Tifford v. Wainwright*, 588 F.2d 954, 956-57 (5th Cir. 1979).

The *Byrd*  court relied in large measure on the Seventh Circuit's decision in *United States v. Echeles*, 352 F.2d 892 (7th Cir. 1965).  In *Echeles*, the court held that the right to a fair trial "necessitated providing [the defendant] the *opportunity* of getting the [exculpatory] evidence before the jury, regardless of how we might regard the credibility of

that witness or the weight of his testimony." *Echeles*, 352 F.2d at 898 (emphasis in original).  The *Byrd* court agreed, although it committed some discretion to the trial court to deny severance where the co-defendant's proffered testimony is a "patent fabrication," or where the likelihood that the co-defendant would actually testify is no more that "a gleam of possibility in the defendant's eye."  *Byrd*, 428 F.2d at 1021-22.

*Byrd* remains controlling precedent in this Circuit, though the original five areas of inquiry have been distilled into a two-part test, each part directing the trial court to weigh four factors. The first part of that test determines if the defendant will be prejudiced if denied the co-defendant's proffered testimony. To satisfy this portion of the test, the defendant must demonstrate:

> (1) a bona fide need for the co-defendant's testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the co-defendant will in fact testify at a separate trial.

*See United States v. Cobb*, 185 F.3d 1193, 1197 (11th Cir. 1999); *accord United States v. Browne*, 505 F.3d 1229, 1269 (11th Cir. 2007); *United States v. DiBernardo*, 880 F.2d 1216, 1228 (11th Cir. 1989); *United States v. Machado*, 804 F.2d 1537, 1544 (11th Cir. 1986). Once the defendant has satisfied the first part of this test, the court is to determine the propriety of severance by weighing four additional factors:

> (1) the significance of the testimony in relation to the defendant's theory of the case, (2) the extent of the prejudice caused by the absence of the testimony, (3) the effect of severance on judicial economy and the administration of justice, and (4) the timeliness of the motion.

*Cobb*, 185 F.3d at 1197; *accord Browne*, 505 F.3d at 1269; *DiBernardo*, 880 F.2d at 1228; *Machado*, 804 F.2d at 1544. Application of this analysis to the facts of this case

demonstrates that Steinger has met his burden of establishing a compelling need for the requested severance.

## THE IMPORTANCE OF MICHAEL MCNERNEY'S TESTIMONY: THE FIRST FOUR FACTORS

### The Substance of and The Bona Fide Need for Michael McNerney's Testimony

McNerney was the lawyer who dealt most closely with Joel Steinger.  He is the only one who can testify how MBC's business model was initially patterned after the one utilized by Life Partners (¶40-44), how he was asked by Joel Steinger to review the MBC business model in light of the ongoing *Life Partners* litigation (¶45) and how he recommended to Steinger and Lombardi that they change MBC's business model to address and alleviate certain concerns expressed by the SEC (¶45-49). McNerney will testify that Steinger followed his legal advice and that MBC implemented the changes that he recommended (¶50-52).  As a result the business model followed by MBC from in or about mid-1996 until it ceased active operations was based upon McNerney's advice to Joel Steinger, Les Steinger and Peter Lombardi (¶53). Most important, McNerney is the only witness who can directly rebut at least three essential cornerstones of the government's prosecution of Steinger.

The first area, which forms a lynchpin of the government's case, is the government's claim that Steinger and the others concealed Steinger's primary executive role at MBC to avoid being compelled to disclose his criminal and regulatory disciplinary history to investors and to regulators (Indictment pp. 12-15, ¶¶8-11), and also concealed numerous regulatory actions against MBC, its principals and its sales agents from prospective investors (Indictment p.15, ¶12).  McNerney's testimony at trial unequivocally will establish

that he had full and complete knowledge of all of the underlying facts relevant to the question of what disclosures needed to be made to investors and regulators, that he gave legal advice to Steinger and MBC concerning what disclosures legally were required to be made to investors and to regulators and that Steinger followed his legal advice.  As further evidence of Steinger's good faith reliance on the advice of counsel, McNerney explains the underlying basis for the legal advice which was given to Steinger and MBC on this subject.

McNerney's testimony also will directly refute the government's contention that the defendants, through MBC's sales force, "falsely promised investors a 'fixed return' on their investment, depending on the life expectancy that MBC predicted for the insured on the particular policy," and provide a good faith reliance on advice of counsel defense to this allegation.  Specifically, McNerney states:

> The Purchase Agreement form stated that the return to the purchaser was a "fixed return on purchase price," that the return was <u>not</u> an annualized return, and that "[i]n the event the Purchaser is required to pay premiums, such payments will reduce the fixed returns referenced above."  <u>Exhibit A</u>, at ¶¶34-35[12].

Another specific area in which McNerney will testify concerns the management of Premium funds in accordance with the Trust Agreement form signed by the purchasers. The Indictment alleges that the manner in which the premium funds were "pooled" and then utilized to pay premiums on older policies in which the insureds had outlived their life expectancies was fraudulent (Indictment pp.18-19, ¶¶22-25).

In direct contradiction of the government's allegations, McNerney will testify

---

[12]The Purchase Agreement is attached as <u>Exhibit A</u> to McNerney's affidavit.

concerning the procedures followed after the "Closing", which was the point at which the prospective purchaser would be substituted as an owner and/or beneficiary under the policy (¶64).  McNerney will discuss the various mechanics of how the premiums on the policies would be paid and discuss the provisions of the Trust Agreement form, which clearly advised purchasers as to how future premiums on a policy were to be paid or satisfied (¶¶65-70).  McNerney's testimony will establish that the premiums were managed in accordance with the Trust Agreement form signed by the purchasers, which was prepared by BMMST lawyers, reviewed by him and approved by the FDOI (¶108).  He will describe and explain the provisions of The Trust Agreement form(¶109) and state that "I advised Livoti and Joel Steinger that the funds held by Livoti as Trustee must be applied to premiums consistent with the language of the Trust Agreements and Purchase Agreements signed by the purchasers"(¶111).

In addition to these specific areas, McNerney's testimony will be significant rebuttal to the government's claims that there was something nefarious in the management structure of MBC. For example, the Indictment alleges that investors were told that premium funds were being managed by an independent trustee, Anthony Livoti, Jr., where in truth Livoti was controlled by Steinger and managed the premium money at Steinger's direction (Indictment pp15-6, ¶14).  McNerney will testify, however, that Livoti was legally obligated to manage the premium funds in accordance with the written provisions of the Trust Agreement Form signed by the purchasers (Exhibit B to affidavit) and that based upon the legal advice given by him and his firm, that was how the premium funds were administered.

In a nutshell, McNerney's testimony will establish a defense to a significant portion of the government's allegations against Steinger.  His testimony will prove that McNerney was a lawyer who was widely recognized and considered to be an expert in the viatical industry, that Steinger regularly consulted with McNerney to determine what disclosures MBC needed to make to prospective purchasers of viatical settlements and to various state regulatory authorities, that Steinger and MBC made a full and accurate report to McNerney of all material facts concerning the viatical and life settlement policies being sold by MBC and revealed the past criminal and regulatory actions taken against both Joel Steinger and others involved in the management of MBC to McNerney.  McNerney's testimony will prove that Steinger and MBC relied upon and acted  in accordance with the advice given by McNerney and the attorneys under McNerney's supervision in deciding what disclosures needed to be made.  McNerney's testimony also will prove that McNerney and his firm drafted the Trust Agreement form which was signed by the purchasers of the policies and pursuant to which premiums for the policies were escrowed and then pooled and utilized to pay premiums.  McNerney's testimony also will establish that Steinger and MBC acted in good faith on his *bona fide* legal advice in managing and paying the premiums consistent with the language of the Trust Agreements and Purchase Agreements

### The Exculpatory Nature and Effect of McNerney's Testimony

The conspiracy, mail fraud and wire fraud offenses with which Steinger is charged all are specific intent crimes, requiring that the government establish as trial that Steinger acted "willfully" with the specific intent to defraud. *E.g. United States v. Svete,* 521 F.3d 1302, 1308 (11th Cir. 2008), *Reversed on other grounds* 556 F.3d 1157 (11th Cir. 2009) (*en*

*banc*); *United States v. Jain,* 93 F.3d 436, 441 (11th Cir. 1996); *United States v. Conner,* 752 F.2d 566, 574 (11th Cir. 1985). *See also* 11th Circuit Pattern Jury Instructions, Trial Instruction 50.1, Mail Fraud and 51.1, Wire Fraud.  Accordingly, this Circuit recognizes that good faith is a complete defense to the charges in this Indictment, since good faith on the part of the defendant is inconsistent with intent to defraud or willfulness which is an essential part of the charges.  *See* 11th Circuit Pattern Jury Instructions, Special Instruction No. 17 "Good Faith Defense to a Charge of Intent to Defraud."

This Circuit also recognizes that a good faith defense to a charge of intent to defraud may be predicated upon a defendant's good faith reliance upon advice of counsel. *See* 11th Circuit Pattern Jury Instructions, Special Instruction No. 18 "Good Faith Reliance Upon Advice of Counsel."   In order to take advantage of this defense, there must be evidence that "before taking any action with regard to the alleged offense, the defendant consulted in good faith an attorney whom the defendant considered competent, made a full and accurate report to that attorney of all material facts of which the defendant had the means of knowledge, and then acted strictly in accordance with the advice given by that attorney."  *Id.  see e.g. United States v. Eisenstein,* 731 F.2d 1540, 1543 (11th Cir. 1984); *United States v. Condon,* 132 F.2d 653 (11th Cir. 1998); *United States v.* Johnson, *139 F.3d 1359, 1366 (11th Cir. 1998).*

McNerney's testimony is absolutely essential for Steinger to be able to establish the defense of good faith reliance on advice of counsel at his trial. As can be seen from McNerney's extensive proffer, his testimony will rebut significant portions of the government's allegations against Steinger with respect to the disclosures made to potential

purchasers of policies and various regulators and with regard to the management and use of the premium reserves. McNerney's testimony will establish his own general qualifications and the fact that he had a relationship with the Steingers going back to the early 1990's, when he represented them and an affiliated company. This testimony, when combined with McNerney's testimony about his experience and expertise in the viatical industry, will prove not only the fact that McNerney was competent to give legal advice on the subject of viatical and life settlements, but that Steinger had a good faith basis to consider McNerney competent to give legal advice on these subjects.[13] McNerney's testimony also will establish that the Steingers disclosed to him all material facts relating to the past criminal and regulatory matters which the government alleges were concealed from potential purchasers of policies and regulatory agencies and that the decisions concerning which disclosures MBC had a duty to make and which information did not need to be disclosed were based upon Steinger's good faith reliance on the advice of McNerney.  McNerney's testimony concerning the management of the premium funds is even stronger because the management of the funds and the payment of premiums on the policies was based upon a Trust Agreement form which McNerney's prepared and which he reviewed and that Livoti and Steinger followed his good faith legal advice that the funds held by Livoti as trustee must be applied to premiums consistent with the language of the Trust Agreements and Purchase Agreements signed by the purchasers.

---

[13]Contrast this with *United States v. Condon,* 132 F. 3d 653 (11th Cir. 1998), where the lawyer consulted by the defendants told them he did not handle SBA loans and had no experience with the SBA.  The court held that the defendants, charged with defrauding the SBA, were not entitled to a jury instruction on good faith reliance on advice of counsel.

In short, McNerney's testimony neutralizes most of the government's allegations against Steinger, allowing the jury to find that Steinger did not act with fraudulent intent when he did not disclose his involvement in MBC or his prior criminal and regulatory history to prospective purchasers and regulators and that nothing fraudulent was intended by the manner in which the premium funds were managed and used to pay premiums due on policies that had not "matured."

### The likelihood that McNerney will testify at a separate trial

In *Byrd*, Court said that severance may be denied where the likelihood that the defendant would testify is no more than "a gleam of possibility in the defendant's eye." 428 F.2d at 1022; *cf. United States v. Shuford*, 454 F.2d 772, 778 (4th Cir. 1971) (defendant must establish a reasonable probability that the co-defendant would testify). In his affidavit, McNerney states his understanding of his privilege under the Fifth Amendment not to testify on his own behalf and states his expectation that he will not testify on his own behalf at a joint trial (¶¶5-6). He states unequivocally that he will not make himself available to testify for his co-defendants at a joint trial(¶7). He goes on to state:

> However, should my trial be severed from my co-defendants' trial, I am unequivocally willing to be called as a witness by any one of my co-defendants at their trial. I am willing to provide truthful testimony that, in my view, is exculpatory as to one or more co-defendants on a number of the allegations at the heart of the government's conspiracy and fraud charges(¶8).

This factor weighs heavily in favor of severance.

### WHY SEVERANCE IS APPROPRIATE:
### THE SECOND FOUR FACTORS

The appropriateness of severance in this case is demonstrated by the significance

of McNerney's anticipated testimony, the extent to which Steinger's defense will be prejudiced if McNerney's testimony is lost and the timeliness of this motion. While separate trials certainly would have an impact on judicial economy, that impact is amply outweighed by the interests of justice served by protecting Steinger's constitutional rights to Due Process of Law and Compulsory Process.

### The significance of McNerney's testimony to Steinger's defense

The significance of McNerney's testimony to Steinger's defense cannot be gainsaid. His testimony directly contradicts and/or explains significant aspects of the government's case against Steinger and provides a complete defense to many of the allegations of the Indictment.  Steinger should be permitted to establish, through McNerney's testimony, that MBC did not make disclosures of criminal and regulatory actions in his past based upon Steinger's good faith reliance upon legal advice that MBC had no legal obligation to make those disclosures.  Steinger should be entitled to prove that he relied in good faith upon the legal advice of McNerney and McNerney's law firm and upon the legal documents drafted by that firm.  Steinger should be permitted to prove through McNerney's testimony that the handling of the Premium Reserve Accounts and the Livoti Trust Accounts was strictly based on the advice of competent counsel.

### The extent of prejudice if a severance is denied

The prejudice which Steinger will suffer if a severance is denied is manifest. McNerney is the only witness through whom a good faith reliance on advice of counsel defense can be presented on Steinger's behalf in a coherent and cogent manner. McNerney is the only witness who combines a long-standing attorney client relationship

with Steinger, with the requisite general qualifications and expertise in the area of viatical and life settlements to give Steinger the good faith basis to believe McNerney was competent to give legal advice in these areas. Indeed, McNerney's testimony will establish that he was uniquely qualified to advise Steinger on these matters. Additionally, McNerney's long-term representation of MBC and his intimate, hands-on experience with the company and its business model over a period of many years helps  prove his knowledge of all of the material facts necessary for him to give the legal advice in question and further supports the conclusion that Steinger acted in good faith in relying on that legal advice. His testimony concerning his involvement in approving the trust agreement and advice to Steinger and Livoti to handle the pooling of premium funds consistent with the terms of the trust agreement is critical to the defense and cannot be duplicated by any other witness or evidence. Indeed, the government has based its charges against McNerney on the predicate that he was intimately involved in all aspects of MBC.[14]

There simply is no other witness or even a combination of witnesses who could provide an adequate substitute for McNerney's testimony on behalf of Steinger.

### The interests of judicial economy and the administration of justice

Where a severance motion is timely filed and the need for the co-defendant's testimony is compelling, the extent to which judicial economy can weigh against severance may properly be called into question. However, as the Eleventh Circuit has observed, "a motion to sever based on the need for exculpatory testimony of a co-defendant implicates

_____

[14] *See* Indictment, ¶s 17-20, pp 5-6.

**SHOHAT, LOEWY & SHOHAT** - PENTHOUSE TWO, 800 BRICKELL AVENUE, MIAMI, FLORIDA 33131-2911

the constitutional rights of the movant." *DiBernardo*, 880 F.2d at 1226.  Considerations of judicial economy, although relevant, "cannot be elevated to the point where they impair a defendant's rights under the Constitution[.]" *United States v. Pepe*, 747 F.2d 632, 651 (11th Cir. 1984); *DiBernardo*, 880 F.2d at 1228 ("[T]he teaching of *Byrd v. Wainwright* and its progeny is that judicial economy must yield to a defendant's right to a fair trial.").

While granting this motion to sever will necessitate two trials, one of McNerney and the other involving the remaining defendants, this is one of those instances in which the fair administration of justice outweighs judicial economy.  Accordingly, a severance should be granted.

### Timeliness of the motion

This motion is being filed within the time period for pretrial motions set by this Court. Trial is not scheduled to commence for another year.  The cases in which severance has been denied on timeliness grounds are those in which the defendant's motion was not made until after the trial had commenced.  *See, e.g., United States v. Funt*, 896 F.2d 1288 (11th Cir. 1990) (motion made in seventh week of trial); *United States v. Perez*, 648 F.2d 219 (5th Cir. Unit B 1981) (motion made after government rested its case-in-chief).  Thus, the timeliness of this motion weighs in favor of granting a severance in this case.

## **CONCLUSION**

Based upon the foregoing reasons and citations of authority, Joel Steinger respectfully submits that this Court should enter an order severing the trial of Michael McNerney from that of the other defendants in this case, so as to enable Steinger to present McNerney's exculpatory testimony at Steinger's trial.

Respectfully submitted,

**SHOHAT, LOEWY & SHOHAT**
Attorneys for Joel Steinger
800 Brickell Avenue, PH-2
Miami, FL 33131-2911
Phone:  305-358-7000
Fax:       305-358-4010
E-Mail: ed@slsdefense.com
        */s/ Edward R. Shohat*
BY_____
    **EDWARD R. SHOHAT, ESQ., #152634**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on <u>January 22, 2010</u>, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record identified on the attached service list in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

Andrew K. Levi, Esq.
Ryan O'Quinn, Esq.
Assistant United States Attorney's Office
99 NE 4th Street
Miami, Florida 33132
Email: <u>Andrew.Levi@usdoj.gov</u>
Email: <u>Ryan.Oquinn@usdoj.gov</u>

Richard G. Lubin
Richard G Lubin PA
1217 S Flagler Drive, 2nd Floor
West Palm Beach , FL 33401-6706
Email: <u>rich@lubinlaw.com</u>

Jose Quinon
2333 Brickell Avenue, Suite A-1
Miami , FL 33129
Email: <u>jquinon@quinonlaw.com</u>

Scott Alan Srebnick
201 South Biscayne Boulevard, Suite 1380
Miami , FL 33131
Email: <u>srebnick@aol.com</u>

Joel Hirschhorn
Hirschhorn & Bieber
550 Biltmore Way,Penthouse Three A
Coral Gables , FL 33134
Email: <u>Jhirschhorn@aquitall.com</u>

*/s/ Edward R. Shohat*

_____
**EDWARD R. SHOHAT, ESQ.**