UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-21158-CR-Jordan

UNITED STATES OF AMERICA

vs.

JOEL STEINGER,
          a/k/a Joel Steiner, and
ANTHONY LIVOTI, JR.,

          Defendants.

**GOVERNMENT'S RESPONSE TO DEFENDANTS
STEINGER'S AND LIVOTI'S MOTIONS TO SEVER**

The United States respectfully opposes defendant Joel Steinger's Motion For Severance So As to Allow Steinger the Opportunity to Present McNerney's Exculpatory Testimony Which Will Be Unavailable to Steinger at a Joint Trial (D.E. 282) and defendant Anthony Livoti, Jr.'s Motion For Severance from Prejudicial Joinder (D.E. 283). The motions should be denied.

**FACTS**

At trial, the government will prove as follows:

From October 1994 through May 2004, Mutual Benefits Corp. ("MBC") purchased life insurance policies from insureds who allegedly had terminal illnesses or short life expectancies, then sold interests in those policies to investors. If the insured died, the policy matured, and the insurance company paid the death benefit to the investor or investors. MBC raised more than $1.25 billion from more than 30,000 investors worldwide through sale of such investments.

Joel Steinger was MBC's principal executive, who managed all important MBC business

activities. Steinger received between one quarter and one third of MBC's profits. In 1981, Steinger had been convicted of mail and wire fraud in the Southern District of Florida. In 1989, he had been barred from the commodities industry. In 1978, 1989, and 1998, he had been civilly enjoined from further violations of federal anti-fraud laws. MBC's corporate records did not list Steinger as an officer or agent of the company. Initially, L.S., now deceased, served as the purported president of MBC. Later, L.S. was replaced by Peter Lombardi. However, throughout MBC's operations, Steinger in fact directed all MBC's activities. Lombardi had few responsibilities other than handling internal accounting at MBC.

Defendant Michael McNerney and his law firm performed a variety of duties for MBC that included both traditional and non-traditional legal services. From 1996 through approximately June 2002, McNerney's firm was MBC's initial escrow agent. As a result, McNerney and his firm accepted MBC investor checks made payable to the firm, and deposited them in a firm-controlled bank account. Also, McNerney and lawyers under his supervision acted as MBC's closing agent on investment transactions, reviewing documents associated with the acquisition, transfer, and sale of insurance policies, and directing disbursement of investor funds. McNerney and lawyers under his supervision also handled MBC's traditional legal services, including drafting and filing regulatory documents and representing MBC and its principals in hundreds of lawsuits and regulatory matters brought by investors who had lost their investments and had alleged that they had been defrauded by MBC. At the same time, McNerney explained and promoted MBC's investments through regularly hosted investor tours at his firm. In many instances, investors met personally with McNerney, who assured them of the soundness of MBC and the investment. McNerney's firm also was listed as a reference in MBC marketing materials.

2

In order to do business, MBC was required to apply for and renew viatical licenses in various states. On the forms it filed for these purposes, MBC was generally required to disclose the identities of its management, but did not disclose Steinger. For instance, in February 1998, MBC submitted its 1997 Viatical Settlement Provider Annual Report to the Florida Department of Insurance. In the report, MBC was required to submit a schedule listing "each individual who is responsible for the conduct of the provider s [sic] affairs or has the ability to exercise significant control over the provider, including but not limited to officers, directors, trustees, partners, shareholders holding a 10 percent or greater interest in the provider, and key personnel." MBC's list included its operations manager and its finance manager, but not Steinger. Ex. 1:BMM0846-1674.[1]

In 1998, McNerney's partners at his law firm expressed concern about the firm's role in preparing state licensing filings for MBC that did not disclose Steinger's role at MBC. The partners decided to seek the legal opinion of an outside attorney, Paul A. Zeigler, regarding the sufficiency of the filings. To obtain that opinion, McNerney wrote a letter to Zeigler on September 3, 1998. McNerney stated that Steinger "has been the most creative person in the company and maintains an office at MBC's offices. While he is not particularly in charge of any aspect of the company's business, he involves himself in many different aspects of the operation and participates in every major business decision affecting MBC." Ex. 2:BMM0533:210-11. McNerney's description of Steinger's role was false: Steinger was in charge of all aspects of MBC's business. After summarizing the purported facts, McNerney asked whether Zeigler would advise MBC to disclose

---

[1] Because of the size of the annual reports, the government has attached only excerpts. The full reports were provided to the defense in discovery.

Steinger's role in the company in its state filings. In response, Zeigler wrote to Lombardi on November 4, 1998. Relying solely on McNerney's letter for the facts, Ziegler recommended disclosure of Steinger's role in future filings, but stated that one could reasonably conclude that such disclosure was not legally required. Ex. 3:BMM0533-41 to 45.

After receiving Zeigler's advice, MBC continued to omit Steinger from its Florida annual reports for calendar years 1998, 1999, and 2000. On its 2001 Florida annual report, filed in 2002, MBC stated that it had a "consulting arrangement" with Steinger, pursuant to which Steinger "provide[d] various services to the company, which include acting as liaison with our attorneys on legal and regulatory matters, participating in the process by which the company decides various of its financial issues, such as short and long-term strategic decisions, and advice on administrative and marketing matters[,]" but that he was not "authorized to enter into viatical settlement contracts on behalf of" MBC. Ex. 4:BMM0846-1804. This description of Steinger's role at MBC was false: Steinger did not simply participate in strategic decisions, but was the ultimate authority who made all such decisions, and he routinely purchased viaticals on behalf of MBC.

During the course of MBC's operations, a number of states issued regulatory cease-and-desist orders against MBC, its principals, and/or its sales agents for securities fraud and registration violations. MBC never disclosed the existence of these regulatory actions to investors.

Steinger caused MBC personnel, salespeople, and promotional materials to make a number of false representations about its policies. To invest in a policy, an investor selected the approximate term of the investment he or she sought, and MBC assigned the investor to a policy whose insured had a predicted life expectancy equal to the investor's selection. The investor paid MBC a percentage of the policy's death benefit; the percentage varied with the life expectancy.

4

MBC represented that an MBC investment was "safe" and "secure" and offered "fixed returns" that depended on the life expectancy of the insured. MBC did not give the investor a copy of the insured's medical file, but MBC assured investors its life expectancies were calculated by independent doctors and that 80% of all MBC policies matured at or before the predicted life expectancies. At other times, MBC assured investors that only 5% of MBC policies went beyond the predicted life expectancies. In reality, Steinger successfully pressured MBC's doctors to assign short life expectancies, and in some cases Steinger assigned the life expectancies himself, after which a doctor simply signed off on Steinger's purported predictions. In part for this reason, the insureds on the great majority of the policies MBC sold throughout its ten years of operation lived beyond MBC's predicted life expectancies.

As the new beneficiary of the policy, an MBC investor had to pay the premiums on the policy or it would lapse, and the investor would receive no payout. MBC told investors that a portion of their investments would be placed in a trust fund administered by an "independent" trustee and used to make the premium payments. The funds were placed in Anthony Livoti's trust fund, but Steinger directed and controlled all Livoti's actions. Similarly, MBC told investors that an "independent" company would monitor the policies after closing and ensure timely payment of premiums from the trust fund. The policies were monitored by Viatical Services, Inc. ("VSI"). VSI was purportedly owned and operated by Ameer Khan, but in fact Steinger entirely controlled its operations.

Some of the policies MBC sold had provisions restricting the transfer of policies to "gift assignments," such that the insured could only transfer the policy as a gift and could not sell the policy for value. To conceal the fact that MBC had bought these policies, potentially rendering

5

them worthless, Livoti signed documents falsely stating that the insured had transferred the policy to Livoti as a "gift" and that Livoti was a "friend" of the insured.

Other material problems with the investments that were not disclosed to potential investors included the sale of interests in policies whose premiums could increase over time or whose death benefits could decrease over time and the reselling of failed investments, where the insureds had already outlived their originally predicted life expectancies and the original investors had successfully sued MBC to obtain refunds.

As a result of the fabricated life expectancy predictions, the failure of the policies to mature, and an inventory of policies with increasing premiums, MBC failed to set aside adequate funds to pay future premium obligations. To conceal this problem of deficient premium reserves and to prevent policies from lapsing, Steinger and Livoti created a Ponzi scheme in which MBC paid premiums on older policies using premium money set aside for newer policies. Investors were never informed about the unsustainable hazard that this scheme created, in that, as more policies went beyond life expectancy, MBC had to sell more and more new policies to fund the premium pool and to prevent the older policies from lapsing.

As a result of the defendants' fraudulent scheme, approximately 28,000 investors have lost approximately $837 million.

On December 23, 2008, Steinger, McNerney, and Livoti were indicted for conspiracy to commit mail and wire fraud, mail fraud, wire fraud, and conspiracy to launder money. D.E. 3. The indictment alleges that the defendants defrauded MBC's investors in six ways. First, they concealed material facts about MBC and its related entities. D.E. 3:12-16. Second, they falsely claimed that MBC's predicted life expectancies were calculated by independent doctors and were highly reliable.

D.E. 3:16-18. Third, they ran a Ponzi scheme in which new investors' premium reserves were used to pay the premiums on older investors' policies. D.E. 3:18-19. Fourth, they sold policies with "gift assignment" restrictions, which policies MBC had acquired based on Livoti's false representations. D.E. 3:19-20. Fifth, they sold policies the terms of which allowed the premium payments to increase or the death benefit to decrease over time. D.E. 3:20. Sixth, they resold failed policies to new investors. D.E. 3:20-21.

On January 22, 2010, Steinger and Livoti separately moved to sever their trials from McNerney's. D.E. 282, 283. The motions were based on an affidavit filed under seal by McNerney, D.E. 269, which Steinger and Livoti summarized. The government opposed McNerney's motion to seal his affidavit. D.E. 295. On September 24, 2010, the Court stated that it would review the affidavit and that, if the government did not hear from the Court's chambers by the end of that day, we should "assume that the description that Mr. Shohat and Mr. Loewy [Steinger's counsel] put in their motion about Mr. McNerney's affidavit is accurate, and that there is nothing of substance left out" and respond to the motions to sever on that basis. D.E. 363:82.[2] Chambers did not contact the government.

## LEGAL ANALYSIS

Defendants who are indicted together should usually be together. *Zafiro v. United States*, 506 U.S. 534, 537-38 (1993) ("There is a preference in the federal system for joint trials of defendants who are indicted together."); *United States v. Knowles*, 66 F.3d 1146, 1158 (11th Cir. 1995). This rule is particularly applicable to conspiracy cases. *United States v. Baker*, 432 F.3d 1189,

---

[2] The Court did not indicate that it would similarly review Livoti's summary of the affidavit, so the government has relied exclusively on Steinger's. Livoti's summary (D.E. 283:4-5) is brief and does not appear to contradict or amplify Steinger's.

1236 (11th Cir. 2005); *United States v. Beale*, 921 F.2d 1412, 1428 (11th Cir. 1991) ("The general rule is that defendants charged with a common conspiracy should be tried together."). Decisions as to whether severance is required are committed to the district court's discretion. *United States v. Smith*, 918 F.2d 1551, 1559 (11th Cir. 1990). In this case, the defendants seek to sever their trials from McNerney's so that they can call him as a witness. To prevail on such a motion,

> [t]he defendant must first demonstrate: (1) a bona fide need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the codefendant would indeed have testified at a separate trial. Once the defendant makes that threshold showing, the court must then: (1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider judicial administration and economy; and (4) give weight to the timeliness of the motion.

*E.g.*, *United States v. Browne*, 505 F.3d 1229, 1269 (11th Cir. 2007).

The government adheres to our view that the defendants have not properly established the substance of McNerney's expected testimony because McNerney's affidavit remains sealed. However, in light of the Court's ruling, the government proceeds on the assumption that the defendants have satisfactorily established the substance of the testimony, the second requirement of the first part of the test for severance. The government also agrees that the defendants have established that McNerney will testify at their trial, the fourth requirement, because Steinger quotes McNerney as stating that he will testify for his codefendants if his trial is severed from theirs. D.E. 282:25. However, the defendants have not established either the exculpatory nature and effect of McNerney's testimony, the third requirement, or a bona fide need for that testimony, the first.

With regard to the exculpatory nature and effect of McNerney's testimony, Steinger and Livoti argue that McNerney's testimony will establish a defense of a good-faith reliance on the

advice of counsel. D.E. 282:22-25, 283:7-8. To make out such a defense, "a defendant must show that (1) he fully disclosed all material facts to his attorney; and (2) he relied in good faith on advice given by his attorney." *United States v. Condon*, 132 F.3d 653, 656 (11th Cir. 1998). As summarized by Steinger, McNerney's affidavit, even if accepted as true, does not support such a defense. McNerney does not claim that the defendants disclosed any of the charged fraudulent practices to him, nor admit that he learned about them from any other source. McNerney's advice did not encompass all the charged fraud, and the defendants could not have relied on the advice McNerney did give, because that "advice," if made with knowledge of the facts, would have purported to authorize the obvious dishonesty. Also, it appears that McNerney's advice primarily concerned state viatical regulations and federal securities law, but the defendants are not charged with violating those statutes. Finally, if McNerney testifies consistently with his affidavit, the jury is unlikely to find him credible.

Steinger first contends that McNerney will rebut the charge that Steinger and Livoti concealed material information about MBC and its management from investors. D.E. 282:20. Livoti briefly makes a similar contention. D.E. 238:4. This portion of the indictment charges that the defendants misled investors by concealing Steinger's status as MBC's chief executive; failing to disclose regulatory orders against MBC, its principals, and its sales agents; falsely representing that Livoti was an independent trustee; and falsely representing that VSI was an independent company. D.E. 3:12-16.

To begin with Steinger's concealment of his control over MBC, it appears that McNerney's advice concerned MBC's disclosure obligations under state viatical law and federal securities law. *See* D.E. 282:7 (McNerney advised MBC that its disclosures on state-approved forms were

sufficient to comply with "state statutes regulating viatical settlements" and "federal securities law"); *see also* D.E. 282:13 (emphasizing McNerney's expertise in the area of "viatical law and regulations"). However, the indictment does not charge that the defendants violated these laws; it charges that they committed fraud by disguising the extent of Steinger's involvement with the company. Whether they also violated other statutes has no bearing on that question.

Furthermore, Steinger does not suggest that McNerney would testify that Steinger disclosed to him that Steinger was in charge of MBC. Steinger does say that McNerney "knew" that Steinger was one of the founders of MBC and "was involved in major decisions affecting MBC . . . ." D.E. 282:8. But these are not the facts that Steinger is charged with concealing. Steinger was not merely "involved in" some unspecified portion of MBC's major decisions; he had final authority over all major decisions at MBC. D.E. 3:5, 12-14. Of course, at trial the defendants will be free to contest the government's evidence and to argue that the indictment inaccurately describes Steinger's role at MBC. However, if the defendants were able to establish this proposition, they would have established that they did not commit this aspect of the fraud, and would no longer need a reliance-on-counsel defense to this aspect of the case.

Finally, if Steinger *had* fully disclosed to McNerney that Steinger was the chief executive of MBC, he could not then maintain that he relied in good faith on McNerney's advice to omit Steinger from MBC's state filings, because even a casual examination of the filings makes clear that MBC was required to disclose the name of the person who in fact controlled all its operations. *See* Ex. 1:BMM0846-1674 (requiring disclosure of "each individual who is responsible for the conduct of the provider s [sic] affairs or has the ability to exercise significant control over the provider, including but not limited to officers, directors, trustees, partners, shareholders holding a 10

10

percent or greater interest in the provider, and key personnel."). A defendant cannot claim "good-faith" reliance on an attorney's purported advice to engage in "obvious dishonesty . . . ." *Condon*, 132 F.3d at 657.

Steinger also contends that the defendants relied in good faith on McNerney's advice when they failed to disclose the many regulatory orders against MBC. D.E. 282:19. Steinger reports that McNerney is prepared to testify that

> [m]y view at the time was that the only purchaser disclosures required by state laws where MBC was licensed were those required by [state viatical statutes]. I was unaware of any state or federal statute that required MBC to disclose pending or past regulatory actions directly to prospective purchasers. Accordingly, I did not advise MBC to make such disclosures directly to purchasers.

D.E. 282:8. As summarized by Steinger, McNerney's affidavit does not state what Steinger, Livoti, or others disclosed to him about the regulatory proceedings. Moreover, McNerney does not state that he gave any advice to Steinger or Livoti, only that he did not affirmatively advise disclosure of the regulatory actions. Finally, based on Steinger's summary of the affidavit, it appears again that McNerney's advice, or absence of advice, concerned MBC's obligations to disclose under state viatical law and federal securities law. McNerney does not report that he advised the defendants about the possibility that MBC's failure to disclose the state actions, combined with the defendants' affirmative misrepresentations regarding Steinger's control over MBC, Livoti, and VSI, constituted fraud. *See Condon*, 132 F.3d at 657 (defendant cannot act in good faith reliance on attorney's failure to warn in area outside attorney's area of expertise).

Steinger also alleges that McNerney will rebut the charge that the defendants falsely characterized Livoti as an independent trustee, D.E. 3:15, by testifying "that Livoti was legally obligated to manage the premium funds in accordance with" the trust agreement, and "that based

upon the legal advice given by him and his firm, that was how the premium funds were administered." D.E. 282:21.[3] That description of McNerney's proposed testimony is somewhat ambiguous; it is not clear whether McNerney alleges actual knowledge of the manner in which Livoti administered the fund, or whether he assumed his advice was followed. But notwithstanding the resolution of this ambiguity, McNerney's testimony, as summarized by Steinger, could not support a defense of good faith reliance on advice of counsel. Steinger does not suggest that he and Livoti fully disclosed to McNerney that Steinger directed all Livoti's activities, nor that McNerney, after receiving such information, advised Steinger or Livoti to characterize Livoti as an "independent trustee." In other words, once again, Steinger does not represent that McNerney would testify that the defendants disclosed the charged facts and that he then advised them to make the charged representations. And even if McNerney were willing to so testify, that testimony would not support a defense of good-faith reliance because, again, McNerney would be advising "obvious dishonesty . . . ." *Condon*, 132 F.3d at 657.

    Finally, the indictment charges that the defendants falsely described VSI as an independent entity that would administer post-closing matters, including the payment of premiums. D.E. 3:16. Steinger does not contend that McNerney is prepared to testify to this subject. Therefore, McNerney's testimony could not support a complete defense to this aspect of the charged fraud.

---

    [3] Unlike the rest of Steinger's summary of McNerney's affidavit, these representations are made only in the argument section of his brief, not in the factual proffer (D.E. 282:5-16). Furthermore, this portion of McNerney's summary, unlike the rest, is not supported by citations to the affidavit itself. And, notably, Livoti's summary of the affidavit does not repeat these allegations, nor does he repeat this argument, although the allegations and argument are particularly applicable to Livoti. The government does not know whether the Court, in reviewing "the description that Mr. Shohat and Mr. Loewy put in their motion about Mr. McNerney's affidavit[,]" D.E. 363:82, reviewed recitations found only in the memorandum of law and not accompanied by citations to the affidavit.

*See United States v. Doherty*, 867 F.2d 47, 55 (1st Cir. 1989) ("A jury need not believe that the defendant did everything the indictment charges; it may convict if it believes he did some of the things the indictment charges and if those things, by themselves, amount to a violation of the statute[,]" provided that the indictment "enable[s] the accused to know the nature and cause of the accusation against him" and protects him from double jeopardy) (internal quotation marks omitted)). That limitation in turn diminishes the purported exculpatory effect of the testimony and weighs against severance.

In addition to his contention that McNerney's testimony will refute the grand jury's allegation that the defendants fraudulently concealed material facts about MBC, Steinger contends that McNerney's testimony will establish that Steinger relied in good faith on McNerney's advice when he promised investors a "fixed return" on their investment. D.E. 282:20-21. As quoted by Steinger, McNerney states in his affidavit that MBC's purchase agreement informed potential investors that their "fixed return" were not an annualized returns, and that, if they were required to pay premiums, such payments would reduce their returns. D.E. 282:10. Steinger adds that McNerney "advised MBC that it was legally permissible to characterize the return to the purchaser as expressly stated in the Purchase Agreement form." D.E. 282:11. However, Steinger again fails to discuss important additional allegations in the indictment. The government does not contend that use of the term "fixed" to describe the returns on a viatical or life settlement investment is per se fraudulent, but rather that it was fraudulent for the defendants to describe the investments they actually sold in that way. Because MBC's predicted life expectancies were wildly inaccurate, most of its policies had a negative present value at the time of investment—the expected cost of the premiums over the life of the insured exceeded the promised death benefit—creating a substantial

13

likelihood that most investors would lose their entire investment and receive no return at all. D.E. 3:17-18. MBC also sold policies with "shrinking face values," meaning that the death benefit decreased over time. D.E. 3:20. Steinger does not suggest that McNerney is prepared to testify that anyone disclosed these facts to him when he sanctioned the use of the term "fixed return."

Finally, Steinger and Livoti contend that McNerney will establish that the defendants' management of the premium fund was conducted in good-faith reliance on McNerney's advice. D.E. 282:20-21, 283:5, 7. However, the portions of McNerney's affidavit quoted by Steinger establish nothing of the sort. As recited by Steinger, McNerney explains that MBC's agreements with its investors called for the premium trustee to place the interest on an investor's premium funds and any premium funds remaining after the policy had matured into a reserve fund. D.E. 282:12. If a policy went beyond its maturation date and exhausted the investor's own premium funds, Livoti was to make premium payments from the reserve fund. D.E. 282:12. If Livoti's reserve fund was depleted, VSI was to maintain a reserve fund for the same purpose. D.E. 282:12. Finally, if VSI's fund too was depleted, the investor was responsible for his or her pro rata share of the premium payments. D.E. 282:12. McNerney, according to Steinger, advised Livoti and Steinger that the funds in Livoti's trust funds "must be applied to premiums consistent with" the summarized agreements. D.E. 282:12. But the defendants are not charged with administering the premium fund consistently with McNerney's supposed advice. Because virtually all insureds lived substantially beyond their predicted life expectancies, investors' premium funds were routinely depleted before the policies matured, and the two reserve accounts were completely insufficient to make the necessary premium payments. To cover this shortfall, the defendants used new investors' premium money—not the interest on that money—to make premium payments on

14

old investors' policies, even though the new investors' policies had not matured either. This procedure required the defendants to recruit larger and larger sums from new investors, and was ultimately unsustainable. Steinger's summary does not suggest that Steinger or Livoti disclosed this scheme to McNerney, nor that McNerney advised them to continue. Once again, the defendants could not prove that they followed McNerney's advice unless they were first capable of proving that they had not committed the charged fraud in the first place.

In assessing the exculpatory effect of McNerney's testimony, the Court should also consider two additional factors. The first is the incomplete nature of McNerney's purported advice. As summarized by Steinger, McNerney does not claim to have advised the defendants to buy policies containing gift assignment provisions under false pretenses, to sell policies with escalating premium payments or shrinking face values, or to resell failed policies, all practices that are charged as fraud. Moreover, as already discussed, McNerney's alleged advice regarding the defendants' misrepresentations about MBC and its affiliated entities was incomplete, because it did not address their misrepresentations about VSI. Thus, McNerney's testimony could never support more than a partial defense to the charged fraud.

Second, although McNerney's predicted testimony, even if fully credited by the jury, would be of marginal or no exculpatory value, the Court should also consider limitations on McNerney's credibility. In the first place, McNerney implausibly advances the self-serving claim that, despite his years of working closely with MBC, he did not know that MBC was engaged in fraudulent conduct. *See Browne*, 505 F.3d at 1270 (upholding denial of motion to sever in part because co-defendant's affidavit "was in no way contrary to her own interests"); *United States v. Novaton*, 271 F.3d 968, 990 (11th Cir. 2001) ("statements concerning the testimony that would become available

by severing trials must be specific and exonerative, rather than conclusory or self-serving, in order to justify severance"); *United States v. Pepe*, 747 F.2d 632, 651 (11th Cir. 1984) (finding co-defendants' proposed testimony "of dubious credibility because it was in no way contrary to [their] own interests"); *United States v. DeSimone*, 660 F.2d 532, 540 (5th Cir. Unit B 1981) (upholding denial of motion to sever in part because "the purportedly exonerating testimony proffered by [the co-defendant] did not contravene his own penal interests, but instead was extremely self-serving"). Moreover, McNerney learned about MBC's actions over the course of years of assisting MBC to conduct its operations. Thus, if McNerney *were* to admit that he knew about any of MBC's fraudulent activities, the jury would be much more likely to conclude that McNerney was a conspirator advising the defendants on how to avoid detection than that he was a legitimate legal advisor who mistakenly recommended an illegal course of action.

For the reasons just discussed, the exculpatory value of McNerney's predicted testimony is negligible or non-existent. In addition, the defendants have not established a bona fide need for the testimony, because they have not established that the testimony they seek is available only through McNerney. Steinger argues that he needs to call McNerney because of McNerney's long-standing attorney-client relationship with Steinger, McNerney's expertise in viatical law, and McNerney's long-term representation of MBC. D.E. 282:27. In the first place, the government itself expects to introduce evidence of McNerney's long-term relationship to Steinger and MBC. More important, the factors on which Steinger relies suggest at most that McNerney was qualified to give legal advice to the defendants, not that only McNerney can testify to that advice. Steinger quotes McNerney to say that he met alone with Steinger "on numerous occasions" and had "many" one-on-one telephone calls with Steinger, D.E. 282:14, but the defendants make no effort to

16

establish that either the defendants' disclosures to McNerney—they describe no such disclosures in any event—or McNerney's advice to the defendants occurred exclusively or predominantly in these one-on-one conversations, nor otherwise explain why they cannot rely on the testimony of others who were present for the relevant conversations. Furthermore, with regard to MBC's disclosures regarding Steinger's role at the company, the defendants could rely in part on the legal advice obtained from Zeigler—the attorney to whom McNerney himself turned for advice.

Because the defendants have not established either that McNerney's testimony would have exculpatory value or that the defendants have a bona fide need for that testimony, they have not met the first, threshold, requirement for a motion to sever. But even if they had established some need for some exculpatory testimony that McNerney might provide, the Court should not sever their trial in light of the other factors the Court must consider, namely, (1) the significance of the testimony in relation to the defendant's theory of the case; (2) the extent of prejudice caused by the absence of the testimony; (3) judicial administration and economy; and (4) the timeliness of the motion. *See, e.g., Browne, supra.*

In this case, the first two factors primarily concern issues that also arose in the first, threshold, part of the severance test. Steinger argues that McNerney's testimony is highly significant to his theory of the case because it establishes a reliance-on-counsel defense. D.E. 282:26. But, as the government has pointed out, McNerney's testimony would have, at best, minimal significance in establishing that defense. Steinger also contends that he would be substantially prejudiced by the absence of McNerney's testimony because only McNerney can testify to the relevant facts. D.E. 282:27. However, as we discussed above, Steinger's arguments actually establish, if anything, that only McNerney could have provided relevant legal advice, not

that only McNerney could testify to that advice. The government agrees that the motions are timely. However, given the complexity of this case and the substantial time that has already passed since indictment, the most significant factor to consider is judicial economy. As the government stated to the Court, even a stripped-down presentation of the government's case would take approximately 164 courtroom hours (considering direct examination only). As discussed in the margin, if Steinger's and Livoti's motions to sever were granted, the two resulting trials would each take approximately that same length of time.[4] Thus, severing Steinger and Livoti would result in two very lengthy trials, with considerable delay to the start of the second trial. That outcome would unduly strain the court's and government's resources and further delay resolution of this case. As the Eleventh Circuit explained in *Pepe*, "[a]lthough considerations of judicial economy cannot be elevated to the point where they impair a defendant's rights under the Constitution or Fed. R. Crim. P. 14, they are relevant . . . ." 747 F.2d at 651 n. 21. Indeed, the *Pepe* court held that "judicial economy weighed heavily against severance in this complex case." *Id.* at 651 (footnotes omitted). *Pepe* involved a five week trial with five defendants. *Id.* at 641, 647. And in *DeSimone*,

---

[4] At Steinger and Livoti's trial, assuming McNerney testified as predicted, the government would have to present the same evidence of McNerney's culpability that we would present in McNerney's own trial. This evidence will establish that, contrary to his testimony, McNerney was a conspirator, not a legal advisor, and therefore that Steinger and Livoti could not have relied on McNerney's "advice" in good faith. Although the government would not have to address defendant Steven Steiner's guilty at Steinger's and Livoti's trial, Steinger and Steiner were brothers who worked together at MBC. As a result, essentially the same evidence applies to each of them. Therefore, presentation of the government's case at Steinger's and Livoti's trial would take approximately as long as at a trial of all four defendants.

Turning to Steiner and McNerney's trial, the government would have to introduce essentially all the evidence regarding Steinger because, as just discussed, that evidence is basically the same as the evidence against Steiner. Although the government could omit evidence applicable exclusively to Livoti, there is little such evidence. Thus, presentation of the government's evidence in Steiner and McNerney's trial would take about as long as that presentation in a four-defendant trial.

18

which involved a thirteen defendant drug conspiracy trial, 660 F.2d at 535, Unit B of the former Fifth Circuit said that "any prejudice occasioned by the absence of [the co-defendant's] testimony was outweighed by the judicial economy considerations inherent in this complex conspiracy case." *Id.* at 540 (footnote omitted).[5]

In light of the minimal probative value of McNerney's proposed testimony and the substantial further delay that severance would entail, the Court should not sever this case.

WHEREFORE, the government respectfully moves the Court to deny Steinger's and Livoti's motions to sever.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:   s/ Marc Osborne
      Assistant United States Attorney
      Court ID# A5500796
      99 NE 4th Street
      Miami, Florida 33132-2111
      Tel: (305) 961-9198
      Fax: (305) 530-6168
      marc.osborne@usdoj.gov

---

[5] If the Court does grant the motions to sever, the government respectfully recommends, if feasible, a joint trial in which the Court empanels separate juries. If the Court were able to try the case in this manner, many, although not all, of the considerations related to judicial economy would be resolved.

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2010 I will electronically file the foregoing with the

Clerk of the Court using CM/ECF.

<u>s/ Marc Osborne</u>
Assistant United States Attorney