**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| | ) |
| v. | ) |
| | ) Case No.: 08-cr-21158 (Scola, J.) |
| | ) |
| JOEL STEINGER, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM IN SUPPORT OF MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Defendant, Joel Steinger, respectfully moves this Court for an order reducing his sentence to time served based on the "extraordinary and compelling reasons" discussed below, pursuant to the newly amended 18 U.S.C. § 3582(c)(1)(A)(i). In light of the coronavirus pandemic—which in part prompts his requested relief—Mr. Steinger's motion can and should be handled without oral argument and on an expedited basis so as to save his life.

**INTRODUCTION**

Joel Steinger, 70, is currently incarcerated at the Federal Medical Center, Butner, in North Carolina. He is approximately five years into a 20-year prison term for related mail and wire fraud conspiracies. Late last year, he requested that the warden move to reduce his sentence, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), based on the "extraordinary and compelling reason" that his advanced age and extraordinary list of serious medical conditions—including spinal stenosis, heart disease, chronic obstructive pulmonary disease, sleep apnea and Hodgkin lymphoma—have left him completely bedridden, incontinent, and requiring total care in all aspects of his daily living. Although counsel has not been able to communicate with Mr.

1

Steinger for days due to coronavirus closures, counsel believes he may be close to dying in prison.

After the warden denied Mr. Steinger's request, the Office of the General Counsel for the Federal Bureau of Prisons (BOP) actually concluded that he "meets the criteria for a reduction in sentence." However, BOP nonetheless denied his requested relief because it "believe[s] Mr. Steinger's release at this time would minimize the severity of his [mail and wire fraud] offense." Whatever the merits of that decision when it was made in January, it is manifestly erroneous at a time when Mr. Steinger's increased exposure to coronavirus in prison—a petri dish of viral contagion—could easily terminate his life given his advanced age and significant preexisting conditions. Mr. Steinger was not given a death sentence for his nonviolent crime, nor does he deserve one.

Following the lead of courts and boards of corrections around the country, this Court can and should reduce Mr. Steinger's sentence to time served in order to save his life from a pandemic to which he is acutely susceptible.

## **FACTUAL BACKGROUND**

In March 2014, Steinger pled guilty to one mail-and-wire-fraud conspiracy count in a 25-count indictment, and to a healthcare conspiracy in another, related indictment charging seven counts. The first, and far more serious, conviction related to Steinger's management of the Mutual Benefits Corporation (MBC). The government charged that from approximately October 1994 to May 2004, the company operated a scheme to defraud investors in fractional interest viatical settlements (third parties' life insurance proceeds) sold by MBC to the public. As the Court will recall, the crux of the scheme was that, from its inception, MBC held life insurance policies for which it had no funds reserved for premiums, so the company was instead using

funds from new investors to pay the premiums required to maintain insurance policies whose payouts had already been sold to earlier investors.

The scheme had additional elements. Although MBC retained physicians to prepare life expectancy reports for investors—whose investments turned on the integrity of third-party actuarial data—Steinger would overrule the physicians' medical judgments without disclosing to investors that the doctors were not making independent determinations. Steinger's false life expectancy representations meant that as viators (terminally ill insured persons who had sold life insurance payouts) continued to survive past the maturity dates of their settlements, MBC exhausted funds it had reserved for policy premiums. Consequently, investors lost their principal and what was falsely described in MBC marketing and promotional materials as a "fixed return." Another element of the deception involved failing to inform investors of the risks inherent in life insurance policies that could not be transferred by viators for value; in group life insurance policies; and in term life insurance policies. The government charged that Steinger was "de-facto CEO" of MBC, managing all important business activities.

At sentencing, the government contended—and the Court found—that the total loss to 28,000 of MBC's viatical investors was over $800 million.[1] Accordingly, Steinger's base offense level under USSG § 2B1.1(a)(1) was fixed at 7; was raised 30 levels under § 2B1.1(b)(1)(P) due to loss over $400 million; raised another 6 levels under § 2B1.1(b)(2)(C) because over 250 victim investors were involved; raised another 2 levels under § 2B1.1(b)(10)(C) for sophisticated means; raised another 2 levels under § 2B1.1(b)(16)(C) for substantially endangering the solvency or financial security of 100 or more victim investors;

---

[1] Steinger maintains that his court-appointed counsel failed to adequately inform him of how the loss amounts were calculated and failed to properly challenge them prior to sentencing. Be that as it may, the relief requested by this First Step Act motion need not entail resolving any ineffective assistance considerations or loss calculation.

raised 4 levels under § 3B1.1(a) because Steinger was an organizer of MBC; and, finally, was raised 3 levels under § 3C1.3 because Steinger committed the second offense (committing healthcare fraud so he could personally have sorely needed health insurance coverage) while on release for the MBC matter. His adjusted offense level of 54 was reduced three levels for acceptance of responsibility and assistance, leaving the total offense level at 51. Aug. 29, 2014 Tr. at 61. With no scored criminal history, Steinger was placed in criminal history category I. The MBC conviction carried a 20-year statutory maximum; the healthcare conviction a 20-year maximum; and there was a possible 10-year consecutive count under 18 U.S.C. § 3147 because the healthcare conviction was committed while Steinger was on release for the MBC matter. So, the total statutory sentence Steinger could receive was 50 years. Because the guidelines called for life, the advisory sentence was 50 years. Aug. 29, 2014 Tr. at 61.

      This Court imposed a sentence of 20 years. Aug. 29, 2014 Tr. at 104. It is true the Court factored in Steinger's various health conditions in varying downward from 50 years—to a degree. *Id.* at 102-103. As the Court put it, "I also think that you should be given consideration for your health problems. I think that you have not done everything you could to ameliorate your problems, and we've had many hearings about that. I don't think that is in dispute, whether you accept it or not. But underlying all of that is that you do have very serious medical issues." *Id.* Nevertheless, more determinative to the Court was avoiding unwarranted sentencing disparities. *Id.* (Another co-conspirator who was "involved at a high level" at MBC received a sentence of *five years*.) And, in another indication of how seriously the Court took his "severe medical problems," the Court explicitly stated in Steinger's plea hearing that "If you are going to be sentenced to a prison term, then I hope that the Bureau of Prisons will designate you to a prison

4

that has a medical facility *to give you the appropriate treatment you want*." Mar. 28, 2014 Tr. at 24-25 (emphasis added).

The Court's concerns were not heeded. Steinger's "severe medical problems" have grown far more serious since 2014. Even a glance at his BOP Health Problems chart shows how many of his various conditions have worsened since sentencing. Joel Steinger Bureau of Prisons Health Services/Health Problems, attached hereto as Exhibit A. Although too numerous to list here, the 70-year-old Steinger's medical conditions exacerbated since sentencing include: his spinal stenosis with neurogenic claudication; chronic neck and back pain; muscle weakness, dysphasia, heart disease, chronic obstructive pulmonary disease; sleep apnea; peripheral neuropathy; edema; obesity; and esophageal reflux. Exh. A. In 2017, years after sentencing, Steinger developed "progressive upper and lower extremity weakness." After sentencing, Steinger was diagnosed with Hodgkin lymphoma. In the sentencing hearing, the Court expressed some chagrin that Steinger had elected not to undergo spinal surgery yet still complained of his stenosis. However, now that Steinger must now be treated for Hodgkin lymphoma, he cannot be a candidate for any surgical interventions to address his spine issues. All of these conditions have conspired to leave him completely bedridden, incontinent of both bladder and bowel. Steinger requires total care in all aspects of his activities of daily living.

Late last year, Steinger requested that the Butner warden move to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). The warden denied his request. Steinger then administratively appealed within the BOP. On January 13, 2020, the BOP denied the appeal. Ltr. from Ken Hyle, General Counsel of BOP, to Thomas J. Scarantino, Complex Warden FCC Butner, North Carolina, attached hereto as Exhibit B. However, the BOP concluded that, in view of the aforementioned medical conditions, Steinger *did qualify* for a reduction in sentence under

5

Section 3582(c)(1)(A).  Exh. B.  Yet, remarkably, the BOP concluded that, notwithstanding Steinger's RIS qualification, "we believe Mr. Steinger's release at this time would minimize the severity of his offense." *Id.*

Undersigned counsel has been attempting to reach Steinger's counselors and the warden at FCC Butner to have him medically reexamined by an independent physician before the filing of this motion.  However, counsel has been unable to reach anyone at the prison during the coronavirus outbreak.  Steinger's counselors do not return the undersigned's phone calls and voicemail messages.

The coronavirus outbreak has led many experts to note the increased exposure of high risk populations to disease within prisons, which are like petri dishes of contagion:

| Health condition | Prevalence of health condition by population | | | |
|---|---|---|---|---|
| | Jails | State prisons | Federal prisons | United States |
| Ever tested positive for Tuberculosis | 2.5% | 6.0% | | 0.5% |
| Asthma | 20.1% | 14.9% | | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | 1.3% | | 0.4% |
| High blood pressure/hypertension | 30.2% | 26.3% | | 18.1% |
| Diabetes/high blood sugar | 7.2% | 9.0% | | 6.5% |
| Heart-related problems | 10.4% | 9.8% | | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

 See Prison Policy Initiative, *No Need to Wait for Pandemics*, available at: http://www.prisonpolicy.org/blog/2020/03/06/pandemic/.

Moreover, Steinger, who is 70 and living with many preexisting conditions, falls within the demographic of those most highly exposed to COVID-19 disease and fatality according to guidance provided by the Centers for Disease Control and Prevention (CDC).  *See*, *e.g.*, The Justice Collaborative, *Guidance on COVID-19 in Release Advocacy*, available at http://thejusticecollaborative.com/wpcontent/uploads/2020/03/TJC_CoronavirusDefenseCourts_

Onesheet_02.pdf.  The CDC has issued guidance that individuals at higher risk of contracting COVID-19—adults over 60 years old and people with chronic medical conditions such as heart disease and diabetes and other conditions that weaken the immune system—take immediate preventive actions, including staying at home.

Indeed, according to a much-cited study by the Chinese Center for Disease Control covering over 72,000 COVID-19 cases, the fatality rate for patients between 70-79 **was nearly 10%.**  See *Characteristics of and Important Lessons from the Coronavirus Disease 2019 Outbreak in China*, Zunyou Wu, MD, *JAMA*, available at: http://jamanetwork.com/journals/jama/fullarticle/2762130.  And, of course, that does not even begin to factor in Steinger's additional risks from his medical conditions including Hodgkin lymphoma, which weakens the immune system.  *See* National Health Service (United Kingdom), COVID-19 update, available at: http://www.nhs.uk/conditions/hodgkin-lymphoma/complications/.

Already jurisdictions around the country have begun releasing prison populations that are susceptible to COVID-19 exposure.  *See*, *e.g.*, *L.A. County Releasing Some Inmates from Jail to Combat Coronavirus*, L.A. Times, Mar. 16, 2020, available at: http://www.latimes.com/california/story/2020-03-16/la-jail-population-arrests-down-amid-coronavirus; *NYC Board of Correction Calls on City to Begin Process of Releasing Certain Prisoners in Response to COVID-19*, Sentencing Law and Policy blog, available at: http://sentencing.typepad.com/sentencing_law_and_policy/2020/03/nyc-board-of-correction-calls-on-city-to-begin-the-process-of-releasing-certain-prisoners-asap-in-re.html.

# ARGUMENT

**I.      The Court Has Jurisdiction to Reduce the Sentence of Steinger, Who Has Standing**

The compassionate release statute was first enacted as part of the Comprehensive Crime Control Act of 1984.  It provided that a district court could not modify a final term of imprisonment except in four situations, one of which was the existence of "extraordinary and compelling reasons" warranting the reduction, as determined by the sentencing court.  But although the courts have the final decision-making authority over whether a sentence would be reduced, the statute imposed a gatekeeper—that authority could be invoked only upon a motion by the Director of the BOP.  Without such a motion, sentencing courts were powerless to reduce a prisoner's sentence, even if the court concluded that extraordinary and compelling reasons warranted the reduction.  18 U.S.C. § 3582(c)(1)(A)(i); *see also* PL 98–473 (HJRes 648), PL 98–473, 98 Stat 1837 (Oct. 12, 1984).

That changed when Congress enacted the First Step Act, which amended § 3582(c)(1)(A). *See* P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018).  Under the amended statute, a court can now reduce a sentence for "extraordinary and compelling reasons" in *two* circumstances: (i) if the Director of the BOP files a motion requesting such relief; or (ii) "upon motion of the defendant," if the defendant has fully exhausted all administrative remedies to appeal the BOP's failure to bring a motion, or if 30 days has lapsed "from the receipt of such a request by the warden of the defendant's facility," whichever is earlier. 18 U.S.C. § 3582(c)(1)(A).  *See also United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *3 (S.D. Tex. June 17, 2019) ("[u]nder the newly amended § 3582(c)(1)(A) [defendant] has standing to bring this motion because more than 30 days elapsed between his reduction-in-sentence request to the warden and a response."); *United States v. Cantu-Rivera*, No. CR H-89-

8

204, 2019 WL 2578272, at *1 (S.D. Tex. June 24, 2019) (defendant's "petition . . . meets the requirement of a lapse of 30 days from the receipt by the warden of the defendant's facility . . . The Court therefore has the authority to address the motion of the defendant.").

Here, jurisdiction exists under the First Step Act amendments because, as indicated above, Steinger has exhausted his BOP administrative appeal.

## II. The Requested Relief Is Consistent with the Text of the Statute and the Sentencing Commission's Policy Statement

### A. Congress Did Not Limit "Extraordinary and Compelling Reasons" to a Specific, Enumerated Set of Medical and Age-Related Circumstances

Congress did not define what would constitute an "extraordinary and compelling reason" warranting a reduction of a sentence under § 3582(c). Indeed, the legislative history confirms that it intended to grant federal sentencing courts broad discretion to make those determinations on a case-by-case basis and to reduce fundamentally unfair sentences where such reasons exist.

Congress's initial goal in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep. No. 98-225, at 52, 53 n.74 (1983). But with the elimination of parole as a corrective measure in cases where early release is warranted, Congress recognized the need for an alternative review process. It therefore allowed for judicial reduction of certain sentences under § 3582(c):

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which *other extraordinary and compelling circumstances* justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

*Id*. at 55–56 (emphasis added).

9

Put differently, rather than having the Parole Commission review every federal sentence, Congress decided to let sentencing courts decide, in a far narrower band of cases presenting extraordinary and compelling circumstances, if "there is a justification for reducing a term of imprisonment." *Id*. at 56.

The situations listed in § 3582(c) were thus intended to serve as "safety valves for modification of sentences," enabling sentence reductions when justified by factors that previously could have been addressed through the (now abolished) parole system. *Id.* at 121. This approach was intended to keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, and permitted "later review of sentences in particularly *compelling situations*." *Id*. (emphasis added). Notably, Congress imposed no limitations on courts' authority to make such determinations, declining to define what constitutes "extraordinary and compelling reasons" or to otherwise constrain judges' discretion. The mandate was simple: If extraordinary and compelling circumstances were present, they would "justify a reduction of an unusually long sentence." S. Rep. No. 98-225, at 55–56 (1983).

Unfortunately, the establishment of the BOP as a gatekeeper effectively eliminated the safety valve. The BOP, which is of course part of the Department of Justice, hardly ever opened the gate.[2] As a result, Congress, through the First Step Act, allowed direct access to the sentencing court once an inmate's request to the BOP has been exhausted.

Following the First Step Act's passage, courts have held that they are vested with discretion to find "extraordinary and compelling reasons" for a reduction in sentence that go

---

[2] *See, e.g.*, *The Answer is No: Too Little Compassionate Release in US Federal Prisons*, Human Rights Watch, 2 (Nov. 2012), https://www.hrw.org/sites/default/files/reports/us1112ForUploadSm.pdf (noting that between 1992 and 2012, the average annual number of prisoners who received compassionate release following a motion by the BOP was less than two dozen).

beyond the technical requirements set forth in BOP regulations and USSG § 1B1.13, application note 1 (setting forth such "extraordinary and compelling reasons" as "terminal illness" and a guideline that a prisoner over 65 years old should be release early when he has "served at least 10 years or 75 percent of his sentence"). *See United States v. Redd*, 97-cr-6, 2020 U.S. Dist. LEXIS 45977 at *7-12 (E.D. Va. Mar. 16, 2020) (district courts vested with discretion to find "extraordinary and compelling reasons" beyond the technical requirements of the guidelines manual or BOP regulations); *Cantu*, 2019 WL 2498923, at *5; *Cantu-Rivera*, 2019 WL 2578272, at *2 n.1; *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

### B. Extraordinary and Compelling Reasons Warrant a Reduction in Steinger's Sentence

Given Steinger's enormous list of severe medical conditions, and his advanced age, he believed he was close to death—*before* the prison population was uniquely exposed to COVID-19. Counsel believes him. Indeed, the General Counsel of the BOP believes Steinger too. Exh. B. In this extremely rare case of agreement, the BOP concedes Steinger *qualifies for compassionate release*. *Id*. Only, it contends that his release at this time would "minimize the severity of his offense." *Id*.

Whatever merit that judgment may have had in January, it is completely eclipsed by the very real possibility his exposure to a pandemic disease will kill Steinger in prison. Steinger is not just within the CDC's High Risk population for COVID-19, he is off the charts at 70 years old and with his stack of medical comorbidities. Exh. A. Steinger's circumstances would constitute "extraordinary and compelling reasons" even before the First Step Act's passage under

11

USSG § 1B1.13, but now that the court has discretion to determine which set of facts constitutes "extraordinary and compelling reasons," there is simply no reason why increased exposure to, and risk of fatality from, a pandemic outbreak would not qualify.

> C. The Remaining Criteria for Reducing the Length of Steinger's Sentence Weigh Strongly in Favor of a Sentence Reduction

In determining whether Steinger's sentence should be reduced, the Court must decide, *inter alia*, whether he presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). USSG § 1B1.13 (2). If he does not, the Court looks to the factors outlined in 18 U.S.C. § 3553(a). All these factors weigh strongly in favor of relief in Steinger's case.

> 1. *Steinger Is Not a "Danger"*

Steinger, 70, is not a danger to the community. As the BOP concedes, his terrifying list of medical comorbidities has rendered him "completely bedridden, incontinent of both bladder and bowel, and requiring of total care with all aspects of his activities of daily living." Exh. B. Even in the realm of sheer speculation it is impossible to conceive of the harm such a man poses to the community, except perhaps to its conscience if it allows a man to die in prison in such circumstances. In any case, Steinger had no scored criminal history prior to the offense, which was nonviolent.

> 2. *The Relevant § 3553(a) Factors Weigh Strongly in Favor of Relief*

Steinger has accepted responsibility for his crime and has expressed explicit and repeated remorse. Due to his severe medical problems, the last approximately five years he has spent in prison have been akin to torture for Steinger. He suffers acutely, every day of his life. His so-called counselor cannot manage to connect Steinger with his attorneys even to discuss the emergency relief sought in this motion. The punishment he has received is sufficient to deter

12

future misconduct. 18 U.S.C. § 3553(a)(2)(B). It is sheer nonsense to contend that the release of a 70-year-old man suffering from countless severe medical conditions during the heart of a pandemic outbreak will somehow encourage future white-collar criminals. And the Sentencing Commission's empirical research establishes the point. As age increases, recidivism by every measure decreases. *See* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, p. 30 (December 2017), available at http://www.ussc. gov/sites/default/files/pdflresearch-and-publications/research-publications/20 17/20171207 Recidivism-Age.pdf ("Among offenders released younger than age 21, 67.6 percent were rearrested *compared to 13.4 percent of those released age 65 or older.* The pattern is consistent across age groups, as age increases recidivism by any measure declined. Older offenders who do recidivate do so later in the follow-up period, do so less frequently, and had less serious recidivism offenses on average.") (emphasis added).

As for avoiding unwanted disparities, 18 U.S.C. § 3553(a)(6), the Court should recall that one of the MBC co-conspirators who was "involved at a high level" in the scheme received *a sentence of five years.* Aug. 29, 2014 Tr. at 102-103. Steinger has already served that time.

**D.     Steinger Deserves Mercy**

With the passage of the First Step Act, Congress emphasized the imperative of reducing unnecessary incarceration and avoiding unduly punitive sentences that do not serve the ends of justice. *United States v. Simons*, No. 07-CR-00874, 2019 WL 1760840, at *8 (E.D.N.Y. Apr. 22, 2019).

Steinger has an 18-year-old son whom he has not been able to contact—together with his other family members—since he began receiving treatment in prison hospitals. When speaking of his love for his son, Steinger frequently cries. Steinger's medical conditions have left him

13

completely hopeless in prison and a prey to infectious disease. But this Court did not sentence him to die in prison. He deserves mercy.

## CONCLUSION

For all the foregoing reasons, Steinger respectfully requests that the Court take this opportunity to grant a reduction in his sentence based on extraordinary and compelling reasons and reduce his sentence to time served.

Date: March 18, 2020.                                             Respectfully submitted.

/s/ Rebekah J. Poston
Rebekah J. Poston (Fl. Bar 0183355)
Partner
Squire Patton Boggs (US) LLP
200 South Biscayne Boulevard, Suite 4700
Miami, Florida 33131
(305) 577-7022 Direct
(305) 577-7000 Main #
(305) 577-7001 Fax
rebekah.poston@squirepb.com |
squirepattonboggs.com

Nicholas D. Smith (VA. Bar. 79745)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
nds@davidbsmithpllc.com

## Certificate of Service

I hereby certify that on the 18th day of March, 2020, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> AUSA Karen Rochlin
> U.S. Attorney's Office
> 99 NE 4th Street
> Miami, FL 33132

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

*/s/ Rebekah J. Poston*